UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

THERESA CRAIG and          )
DENISE RUNDLE,             )
                          )
          Plaintiffs,      )
                          )
                          )    CIVIL ACTION NO.
                          )    13-11358-DPW
          v.              )
                          )
MERRIMACK VALLEY HOSPITAL, )
A STEWARD FAMILY HOSPITAL, )
INC; DIANE LOVALLO, and    )
KATHLEEN M. MACDOWELL,      )
                          )
          Defendants.      )

MEMORANDUM AND ORDER
September 18, 2014

Plaintiffs Theresa Craig and Denise Rundle filed this action

in Massachusetts state court, alleging claims for defamation,

intentional interference with contractual relations, and

intentional infliction of emotional distress arising from the

circumstances surrounding the termination of their employment as

nurses at Defendant Merrimack Valley Hospital ("MVH").  The

defendants removed the case to this court, and now move to

dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(6) on

grounds that Plaintiffs' claims are preempted by the federal

Labor Management Relations Act ("LMRA"), and otherwise fail to

state a claim on which relief may be granted. Plaintiffs oppose the motion to dismiss and seek remand to state court. For the reasons explained below, I will deny Defendants' motion to dismiss on preemption grounds except as it pertains to the claim against MVH for defamation by conduct, and will grant Plaintiffs' request to remand the remaining claims to state court.

## I. FACTUAL BACKGROUND

For purposes of this motion to dismiss, I take as true all well-pleaded facts in the operative pleading (Plaintiffs' Amended Complaint and Jury Demand; Doc. No. 24) and draw all reasonable inferences arising therefrom in Plaintiffs' favor. *Phoung Luc* v. *Wyndham Mgmt. Corp.*, 496 F.3d 85, 88 (1st Cir. 2007).

### A. The Parties

Ms. Craig and Ms. Rundle were both employed as nurses at Merrimack Valley Hospital in Haverhill, Massachusetts; Ms. Craig began working there in December 2005, and Ms. Rundle in April 2003. Am. Compl. ¶¶ 8-9. Throughout the majority of their tenures, until approximately early 2011, Ms. Craig and Ms. Rundle consistently received "glowing" performance reviews and were considered model employees. *Id.* at ¶ 10. In 2010, Ms. Rundle received an employee of the month award. *Id.* Through the years, both nurses were steadily praised and given salary increases.

*Id.* at ¶ 11.  As of May 2011, Ms. Craig and Ms. Rundle were earning approximately $50 per hour.  *Id.* at ¶ 13.

Typical duties for Ms. Craig and Ms. Rundle included walking rounds, listening to shift reports, conducting patient assessments, administering medication, performing medical treatments, attending rounds with doctors and social workers, taking and transcribing doctors' orders, reviewing laboratory and other diagnostic results, dealing with families, alerting management of staffing concerns, initiating incident reports, and entering computer data.  Am. Compl. ¶ 12.

At all times relevant to the present dispute, Defendant Diane Lovallo was the Director of Nursing at MVH.  Am. Compl. ¶ 14.  Defendant Kathleen MacDowell was Plaintiffs' direct supervisor, having assumed that position when their previous supervisor, Stacy Steeves, terminated her employment with MVH at the end of 2009.[1]  *Id.* at ¶¶ 15, 16.  Ms. Craig and Ms. Rundle reported directly to Ms. MacDowell (as they had previously to Ms. Steeves), who in turn reported to Ms. Lovallo.  *Id.* at 16.

According to Plaintiffs, Ms. Steeves engaged in conduct that was detrimental to patient care and safety, violated HIPAA regulations, breached patient confidentiality, and falsified

---

[1]Ms. Steeves is not a party in this action.

payroll information.  Am. Compl. ¶ 19.  Despite the fact that the Massachusetts Nurses Association ("MNA") strongly encourages the use of forms to identify unsafe staffing - in part because they are designed to protect nurses from liability - both Ms. Steeves and Ms. Lovallo discouraged nurses from filing reports detailing concerns over patient safety.  *Id.* at ¶¶ 20-21.

In the summer of 2009, Ms. Rundle and another nurse, Amy Rock, reported to Ms. Steeves that they witnessed a Certified Nursing Assistant ("CNA") pulling back the thumb of a dementia patient and another CNA yelling at the same patient.  Am. Compl. ¶ 17.  One of the CNAs involved in the alleged abuse was a friend of Ms. Steeves.  *Id.*  Ms. Steeves reported this incident to Ms. Lovallo.  *Id.*  In response, Ms. Lovallo disparagingly coined the phrase "the summer girls," to refer to Ms. Craig, Ms. Rundle, Ms. Rock, and to another nurse, Kristine Ferrera, in connection with their involvement in reporting the alleged abuse.  *Id.* at ¶ 18.

Ms. Steeves then undertook a campaign of harassment and threats against Ms. Craig, Ms. Rundle, Ms. Rock and Ms. Ferrara, including posting comments on Facebook.  Am. Compl. ¶ 23.  Among Ms. Steeves' Facebook posts was a comment stating: "I want to bash [Craig's] teeth down her throat" to which another co-worker responded "Don't worry, I'll blow them all away with an AK-47."  *Id.* at ¶ 23.  Ms. Steeves yelled at Ms. Ferrera regarding unsafe

staffing forms. Id. at ¶ 24. She told Ms. Ferrara, "If you
don't like it, don't let the door hit you in the ass." *Id.* The
plaintiffs felt that Ms. Steeves was able to "paralyze the staff
with her fear tactics, which were reinforced and supported by Ms
Lovallo." *Id.*

MVH investigated Ms. Steeves' alleged misconduct on or about
December 19, 2009; MVH and Ms. Steeves then ended their
employment relationship. Am. Compl. ¶ 25. Ms. Lovallo told Ms.
Craig that the allegations regarding the Facebook threats should
not be discussed, and if the story surfaced, those responsible
would be terminated. *Id.* at ¶ 26. On or about December 15,
2009, Ms. Lovallo told the nurses' union representative, Jim
Kane, that Ms. Craig and Ms. Rundle had fabricated the entire
Facebook story that led to Ms. Steeve's termination and that Ms.
Craig and Ms. Rundle, and not Ms. Steeves, were responsible for
the Facebook posts at issue. *Id.* at ¶ 27. Ms. Craig and another
nurse were present when Ms. Lovallo made this allegedly false
allegation. *Id.*

Plaintiffs allege that Ms. Lovallo was determined to exact
revenge upon them (and the two other "summer girls," Ms. Rock and
Ms. Ferrera) because she blamed them for the termination of her
friend, Ms. Steeves. Am. Compl. ¶ 28. Ms. Lovallo told Ms.
Rundle that she had "unfinished business" to discuss with her,

apparently based on allegations that Ms. Steeves had disseminated about Ms. Rundle. *Id.* at ¶ 32. On or about December 22, 2012, Ms. Lovallo told Ms. Rundle in an intimidating tone that she was going to "get rid of you 'summer girls' one way or another" and that she was "not finished with you 'summer girls' yet." *Id.* at ¶ 33. Ms. Rundle reported this threatening incident to Ms. Ferrara. *Id.* at ¶ 34. Ms. Rundle was upset and crying, and Ms. Ferrara helped calm her down so she could go back to work. *Id.*

On another occasion, Ms. Rundle contacted Ms. Lovallo and informed her that she was scared to walk to her car at night after her shift because of the threats on Ms. Steeves' Facebook page and other incidents, including one involving a secretary whose home mailbox was "blown up" and another involving a woman who had the air let out of her tires. Am. Compl. ¶ 35. Ms. Lovallo told Ms. Rundle that Ms. Steeves was no longer Ms. Lovallo's responsibility, but that she could ask security to walk her out if she so desired. *Id.* at ¶ 36. Ms. Rundle did not feel comfortable being walked out by security, since one of the security guards was friendly with Ms. Steeves and played a role in the Facebook threats.

Plaintiffs allege that Defendant Ms. MacDowell became part of the scheme of intimidation when she replaced Ms. Steeves as their direct supervisor. *Id.* at ¶ 29. Ms. MacDowell frequently

encouraged Ms. Craig and Ms. Rundle to sneak out for a cigarette, saying she would "look the other way and never tell," despite the fact that smoking while on duty was grounds for immediate termination. *Id.*

In early 2011, there were several deaths and patient falls at MVH. Rock and Ferrera submitted unsafe staffing forms in connection with these incidents. Am. Compl. ¶ 37. In March 2011, the union representative made a formal request for additional staff. *Id.* at ¶ 38. Around the same time, an angry Ms. Lovallo came to a staff meeting, which included Ms. Rundle, and said: "You nurses have the highest number of unsafe staffing forms, and it has to stop!" *Id.* at ¶ 39. Ms. Lovallo told the nurses that "you are lucky to have jobs," and that the "disrespect" for management had to stop. *Id.*

**B.  *Events Leading to Plaintiffs' Termination***

Defendants never disciplined Plaintiffs in any way or expressed any dissatisfaction with their job performance prior to the point at which Plaintiffs raised concerns about Ms. Steeves. Am. Compl. ¶ 31.

On or about February 2011, MVH introduced a new computer system for nurses to update or enter information into patient medical records. Am. Compl. ¶ 40. Certain keys had different functionality than in the past; for example, the F5 key was used

to "recall" information while the F12 key would save new information. *Id.* The nurses were not trained sufficiently on the new system and were not informed of the specific functionality of each key. *Id.* at ¶ 41. The lack of sufficient training and support left the nurses to learn the system on their own and from each other. *Id.*

Of particular relevance to this case, MVH did not instruct nurses on the function of the F5 key or that it was the policy of MVH's parent company, Steward Health Care, to refrain from using the F5 key. Am. Compl. ¶ 42. Some of the nurses had used the same system at other hospitals, and accordingly, those nurses were more familiar with the system and the function of the F5 key specifically. *Id.* at ¶ 43. From their colleagues who had some experience with the system, the plaintiffs learned about the F5 key. *Id.* at ¶ 44, They were not told and did not know that they had to delete something called the "comment box." *Id.* Plaintiffs contend that use of the F5 key is highly confusing, as it apparently functions to recall the previous shift nurse's patient notes and documentation similarly to a "copy and paste" function. *Id.* Plaintiffs used the F5 key, and did so without a full understanding of how the key worked or what impact its usage would have. *Id.* at ¶ 45. They had no intent to do anything wrong or dishonest. *Id.* They merely copied and pasted notes

from a previous entry rather than re-type the same note. *Id.* To Plaintiffs, and the other nurses who had instructed them on the use of the F5 key, the key seemed to be a useful and time saving tool. *Id.*

Despite the fact that Plaintiffs were never properly trained on the use of the F5 key or told that it was against Steward policy to use it, Ms. Lovallo and Ms. MacDowell "predatorily seized upon the use of the F5 key as an opportunity to retaliate against Ms. Craig and Ms. Rundle for their reporting of Ms. Steeves' conduct." Am. Compl. ¶¶ 46-47. Ms. Lovallo and Ms. MacDowell maliciously construed the mere act of copying and pasting text to rise to the level of purposefully falsifying patient records. *Id.* at 48. As a result, Plaintiffs were charged with a Level III infraction, which is typically reserved for serious transgressions such as lying on a job application or altering payroll records. *Id.* at 49.

On May 3, 2011, Ms. MacDowell questioned Ms. Craig and accused her of falsifying patient records in front of Kathleen Ryan, an MVH Nurse Educator, and Yinelle Casado from MVH Human Resources. Am. Compl. ¶ 50. On that same day, Ms. MacDowell also questioned Ms. Rundle and accused her of falsifying patient records in front of Ms. Ryan, Ms. Casado, and Kathy Renzi, Ms. Rundle's union representative. *Id.* at ¶ 51. Plaintiffs allege

that Ms. MacDowell's accusations against them were carried out at the request or with the consent of Ms. Lovallo and MVH.  *Id.* at 52.  On May 6, 2011, Plaintiffs were terminated for "falsifying patient records."  *Id.* at 53.

## C.  *Post-Termination Events and Arbitration*

Following their termination, Plaintiffs were approached by many personal friends and professional peers and colleagues, both within the hospital and in the general community, asking what had happened at MVH and why they had been summarily fired.  Am. Compl. ¶ 54.  These people "constantly peppered" Plaintiffs with intrusive and embarrassing questions about the circumstances of their departure from MVH.  *Id.* at ¶ 55.  It became clear to Plaintiffs that many people believed they were no longer working at MVH "because of some suspicious, controversial, or negative reason or occurrence."  *Id.*

The conduct of Defendants "prejudiced the plaintiffs' profession and business, as well as their ability to work and provide for themselves and their families."  Am. Compl. ¶ 56. For a period of time, and perhaps indefinitely, Plaintiffs "lost their good standing in the community with people who previously viewed them as hard-working, respected, honest professionals." *Id.* at 57.

Just prior to her termination from MVH, on or about May 5, 2011, Ms. Craig began work at a part-time second job at Town and Country Health Care Center in Lowell, Massachusetts. Am. Compl. ¶ 58. Ms. MacDowell had encouraged Ms. Craig to apply for the position with Town and Country. *Id.* at 59. After being terminated from MVH, Ms. Craig informed the administrator at Town and Country, Norman Michaud, that she had lost her job at MVH. *Id.* at 60. In her conversation with Mr. Michaud, she specifically referenced the conversation with Ms. MacDowell in which Ms. MacDowell had terminated her. *Id.* Mr. Michaud informed Ms. Craig that he would speak to Ms. MacDowell about Ms. Craig's termination. *Id.* at 61. Mr. Michaud apparently knew Ms. MacDowell personally. *Id.* After speaking to Ms. MacDowell, Mr. Michaud terminated Ms. Craig from Town and Country. *Id.* at 62.

Arbitration hearings between Plaintiffs and MVH were held in late 2011 and throughout 2012. Am. Compl. ¶ 63. The only issue arbitrated was whether Plaintiffs were terminated for just cause. *Id.*; Exh. A to Pls.' Mot. to Remand at 1. On March 25, 2013, the arbitrator ruled that MVH failed to prove that it had just cause to terminate Plaintiffs for purportedly falsifying medical records and that instead of terminating Plaintiffs, the hospital should have trained them properly on the use of the F5 key. Am. Compl. ¶ 64; Exh. A at 57-58. Plaintiffs were awarded back pay

and lost benefits.[2]  Am. Compl. ¶ 66; Exh. A at 59.  The

arbitrator specifically found that Plaintiffs were "singled out

for copying and saving as their own comment box text from earlier

shifts through use of the F5 key when other nurses [who] were

also using the F5 key in the same manner were not disciplined at

all, much less terminated."  Am. Compl. ¶ 67; Exh. A at 56.

The arbitrator did not consider claims for defamation,

intentional interference with contractual relations, or

intentional infliction of emotional distress, and did not

consider any questions of personal liability on the part of Ms.

Lovallo or Ms. MacDowell.[3]  Am. Compl. ¶ 67.; Exh. A at 1.

Plaintiffs argue that absent the current proceedings, there is no

relief available to them for those wrongs.  Am. Compl. ¶ 67.

Since her termination, Ms. Craig has been working for wages

less than what she earned at MVH.  Am. Compl. ¶ 68.  Ms. Rundle

was unable to work for approximately four months.  *Id.* at 69.

She has since found employment, but at a salary far less than

---

[2] The Arbitrator also ordered MVH to reinstate Plaintiffs to
their former positions, although Plaintiffs do not appear to have
pled this fact.  Because of the drawn out nature of the
arbitration proceeding, the order of reinstatement came almost
two years after Plaintiffs' termination.

[3] Although the arbitrator noted Plaintiffs' allegations of
retaliation, she declined to address them, concluding that they
were "speculative and unnecessary to the determination of this
case."  Exh. A at 57 n.37  She did however find that Plaintiffs
were "singled out" for their use of the F5 key.  *Id.* at 56.

what she earned at MVH. *Id.* Plaintiffs allege that they suffered severe emotional distress as a result of the significant damage to their reputation and loss of their jobs. *Id.* at 70. Both Ms. Craig and Ms. Rundle sought medical care and took medication as a result of the defendants' conduct. *Id.* at 71.

## II. ANALYSIS

### A. Standard of Review on Motion to Dismiss

In order to survive a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotation marks omitted). Dismissal for failure to state a claim is appropriate when the pleadings fail to set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Berner* v. *Delahanty*, 129 F.3d 20, 25 (1st Cir. 1997) (quoting *Gooley* v. *Mobil Oil Corp.*, 851 F.2d 513, 515 (1st Cir. 1988) (internal quotation marks omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Maldonado*

v. *Fontanes*, 568 F.3d 263, 268 (1st Cir. 2009) (quoting *Iqbal*, 556 U.S. at 679).

I "must accept all well-pleaded facts alleged in the Complaint as true and draw all reasonable inferences in favor of the plaintiff." *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993). While I am "generally limited to considering facts and documents that are part of or incorporated into the complaint," I "may also consider documents incorporated by reference in the [complaint], matters of public record, and other matters susceptible to judicial notice." *Giragosian* v. *Ryan*, 547 F.3d 59, 65 (1st Cir. 2008) (citation and internal quotation marks omitted; alteration in original). In this case, Defendants have submitted, and I have reviewed, the Collective Bargaining Agreement between MVH and the Massachusetts Nurses Association, as well as the March 25, 2013, arbitration award.

## B.  *Legal Framework*

Because Plaintiffs plead claims arising under state law, the "well-pleaded complaint" rule would ordinarily prohibit the exercise of federal question jurisdiction between the non-diverse parties to this action. *See* 28 U.S.C. § 1441(c); *Franchise Tax Bd.* v. *Construction Laborers Vacation Trust*, 463 U.S. 1, 9-11 (1983). Defendants, however, argue that § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, "completely preempts"

Plaintiffs' claims, effectively "transmuting the state law claims into federal claims and permitting removal under federal question doctrine." *Cavallaro* v. *UMass Mem'l Healthcare, Inc.*, 678 F.3d 1, 3-4 (1st Cir. 2012). "'Complete preemption,' as distinct from the more familiar concept of defensive preemption, applies where a purported state law claim is either re-characterized as a federal claim or—and here Supreme Court doctrine has become unstable—is otherwise so related to federal law as to permit the removal." *Id.* at 4.

Read literally, § 301 of the LMRA confers federal jurisdiction over "[s]uits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce." 29 U.S.C. § 185(a). "Over the years, however, the Supreme Court has placed a heavy gloss on this language," *Flibotte* v. *Penn. Truck Lines, Inc.*, 131 F.3d 21 (1st Cir. 1997), treating § 301 as a mandate for the development and application of federal common law regarding labor law and as a basis for removing claims preempted by § 301 to federal court. *See Allis-Chalmers Corp.* v. *Lueck*, 471 U.S. 201, 211 (1985). Partly to ensure uniformity and predictability in the interpretation of collective bargaining agreements, *Lueck*, 471 U.S. at 211, and "[p]artly to protect the use of arbitration and grievance procedures common to CBAs, the Supreme Court declined

to limit complete preemption to contract claims *eo nomine*,"
*Cavallaro*, 678 F.3d at 5, instead extending complete preemption
to "state law claims 'founded directly on rights created by
collective-bargaining agreements' or 'substantially dependent on
analysis of a collective bargaining agreement.'" *Id.* (quoting
*Lueck*, 471 U.S. at 211). "Today, labor-law preemption casts a
relatively wide net," *Flibotte*, 131 F.3d at 26, with § 301
preempting a state law claim "if the resolution of [that] claim
depends on the meaning of the collective-bargaining agreement."
*Lingle* v. *Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 405-06
(1988).

However, "this rule is not without limitations." *Flibotte*,
131 F.3d at 26. The Supreme Court has emphasized that § 301 does
not preempt all disputes between a unionized employee, working
under a collective bargaining agreement, and his or her employer.
*See Lueck*, 471 U.S. at 211 ("Of course, not every dispute
concerning employment, or tangentially involving a provision of a
collective-bargaining agreement, is pre-empted by § 301"); *Lydon*
v. *Boston Sand & Gravel Co.*, 175 F.3d 6, 10 (1st Cir. 1999) ("the
doctrine does not preclude all state law claims that are somehow
linked to a labor dispute"). Further, "even if the dispute
resolution pursuant to a collective-bargaining agreement, on the
one hand, and state law, on the other hand, would require

addressing precisely the same set of facts, as long as the state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 pre-emption purposes." *Lingle*, 486 U.S. at 409-10. The Court in *Lingle* similarly observed that a state law claim will not be preempted simply because the calculation of damages – as opposed to the determination of liability — requires reference to a collective bargaining agreement. *See id*. at 413 n.12; *Livadas* v. *Bradshaw*, 512 U.S. 107, 124 (1994) ("the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished"). In other words, the difference between preempted and non-preempted state law claims is that the former present "a *real* interpretive dispute" involving a collective bargaining agreement. *Martin* v. *Shaw's Supermarkets, Inc.*, 105 F.3d 40, 42 (1st Cir. 1997) (emphasis in original).

The need to draw this not altogether legible line between preempted and non-preempted cases is rooted in the purpose behind § 301, as explained by the Supreme Court in *Livadas*:

> [T]he preemption rule has been applied only to assure that the purposes animating § 301 will be frustrated neither by state laws purporting to determine questions relating to what the parties to a labor agreement agreed, and what legal consequences were intended to flow from breaches of that agreement, nor by parties' efforts to renege on their arbitration promises by "relabeling" as tort suits actions

simply alleging breaches of duties assumed in collective-bargaining agreements.

512 U.S. at 122-23 (internal quotations and citations omitted).

In an attempt to synthesize the various statements of the Supreme Court on this topic into a readily applicable doctrine, the First Circuit has reasoned that a state-law claim can "depend" on the "meaning" of a collective bargaining agreement — and will thus be preempted by § 301 — in two ways:  First, where a claim "alleges conduct that arguably constitutes a breach of a duty that arises pursuant to a collective bargaining agreement," *Flibotte*, 131 F.3d at 26 (citing *United Steelworkers* v. *Rawson*, 495 U.S. 362, 369 (1990)), and second, where the "resolution [of a claim] arguably hinges upon an interpretation of the collective bargaining agreement."  *Flibotte*, 131 F.3d at 26 (citing *Lueck*, 471 U.S. at 220).

With the foregoing principles in mind, I examine each of Plaintiffs' claims to determine whether it alleges a breach of a duty arising under the CBA, or otherwise depends on an interpretation of that CBA.

    1.  Defamation (Count I)

Plaintiffs bring claims of defamation, by statements and by conduct, respectively against Ms. MacDowell and MVH.  They allege that MVH and Ms. MacDowell "engaged in a smear campaign designed

-18-

to harm plaintiffs," Am. Compl. ¶ 73, which they accomplished by "maliciously accusing Plaintiffs of falsifying patient records and charging them with a Level III infraction in retaliation for their lawful complaints." *Id.* at ¶ 74. Plaintiffs specifically point to the accusations Ms. MacDowell made regarding Ms. Craig in front of MVH Nurse Educator Kathleen Ryan and MVH Human Resources representative Yinelle Casado, and similar accusations made regarding Ms. Rundle to Yinelle Casado and union representative Kathy Renzi. *Id.* at ¶ 76. As a result of these accusations and the plaintiffs' resulting termination, Plaintiffs allege that their reputations have been tarnished and that they "have been held up to scorn, hatred, ridicule, and contempt." *Id.* at ¶ 86-87. Further, Plaintiffs allege that "MVH's termination of the Plaintiffs communicated and conveyed a clear and unambiguous statement to the MVH community, and to colleague and friends of Ms. Craig and Ms. Rundle, that Plaintiffs engaged in wrongful conduct, since, under the collective bargaining agreement, MVH could only terminate Plaintiffs for cause. . . ." *Id.* at ¶ 89.

Relying primarily on two decisions by judges in this district, *Cullen* v. *E.H. Friedrich Co., Inc.*, 910 F. Supp. 2d 815 (D. Mass. 1995) and *Rogers* v. *NSTAR Electric*, 389 F. Supp. 2d 100 (D. Mass. 2005), Defendants argue that Plaintiffs' defamation

claims are preempted by § 301 because the claims "directly relate to the circumstances around [their] discharge," *Cullen*, 910 F. Supp. 2d at 824, and "require[] an examination of the CBA to determine whether it allows the [employer], in the course of business, the conditional privilege to publish comments about plaintiff[s] in [their] 'personnel files' or otherwise during the course of employment." *Rogers*, 398 F. Supp. 2d at 111. In a further attempt to tie the defamation claims to the CBA, Defendants argue that "[t]he alleged 'false accusations' directly relate to MVH's right to investigate misconduct and discharge its employees for cause," as provided for in the CBA.

To prevail on a claim for defamation under Massachusetts law, a plaintiff must prove that "the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." *White* v. *Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004). "The element of publication is satisfied where the defamatory communication is transmitted to even one person other than the plaintiff." *Phelan* v. *May Dept. Stores Co.*, 819 N.E.2d 550, 554 (Mass. 2004). While "[a]n employer has a conditional privilege to disclose defamatory information concerning an employee when the publication is

reasonably necessary to serve the employer's legitimate interest
in the fitness of an employee to perform his or her job," that
privilege may be lost by abuse, such as where the "plaintiff
proves that the communication was motivated by malice or was an
unnecessary, unreasonable, or excessive publication." *Bratt* v.
*Int'l Bus. Mach.*, 467 N.E.2d 126, 129, 131 (Mass. 1984). "Malice
. . . may consist either in a direct intention to injure another,
or in a reckless disregard of his rights and of the consequences
that may result to him." *Id.* at 131 (quoting *Petition of
Retailers Commercial Agency, Inc.*, 174 N.E.2d 376, 380 (Mass.
1961).

The First Circuit does not appear to have considered the
issue whether § 301 preempts state law claims for defamation.
Courts that have addressed the issue have reached divergent, and
in some instances, seemingly irreconcilable results. As an
initial matter, it is clear that a typical defamation claim by an
employee against an employer or fellow employee or supervisor
does not allege a breach of a duty arising from a collective
bargaining agreement, and therefore, the proper inquiry must be
focused on whether the "resolution [of the claim] arguably hinges
upon an interpretation of the collective bargaining agreement."
*Flibotte*, 131 F.3d at 26 (citing *Lueck*, 471 U.S. at 220). It has
been observed that, as a general matter, courts hold defamation

claims preempted where the allegedly defamatory statements were made in conjunction with formal grievance proceedings under the applicable collective bargaining agreement, and not preempted where the claims "clearly did not arise out of conduct relating to the grievance and arbitration procedures in a CBA." *See Cullen*, 910 F. Supp. 2d at 824 & n.5 (surveying cases and noting that in "the vast majority of cases finding preemption," the defamation claims at issue "are based on facts inextricably intertwined with the grievance and arbitration machinery of the CBA"), and cases cited. Although this distinction sounds straightforward enough, in practice there appears to exist a significant difference of opinion concerning when the facts of a defamation claim are "inextricably intertwined" with a CBA-mandated grievance process.

Two broad categories of circumstances in workplace defamation can be identified. One category includes allegedly defamatory statements made in conjunction with the formal adjudication of a grievance pursuant to a CBA, *see Cullen*, 910 F. Supp. at 823 (holding as preempted defamation claim arising from letters prepared by company president as part of grievance proceedings). The other category includes defamatory statements that are alleged to have improperly caused or influenced the decision to initiate disciplinary proceedings to begin with. *See*

*Johnson* v. *Anheuser Busch*, *Inc.*, 876 F.2d 620, 624 (8th Cir.
1989) (holding as preempted plaintiff's defamation claims against
employer and individual co-workers, arising from allegedly false
statements by co-workers that employee had slashed tires in
company parking lot where "those statements resulted in
[plaintiff's] discharge").[4]

Confusion appears to arise from a fundamental, yet often
inadequately articulated difference of approach regarding two
related issues:

First, whether the resolution of a defamation claim depends
on the interpretation of a CBA simply because the allegedly
defamatory statements can be said to "directly relate to the
circumstances surrounding [an employee's] discharge," *Cullen*, 910

---

[4] Although the Eighth Circuit does not make clear its rationale
in *Johnson*, the seemingly overbroad statement that the
plaintiff's defamation claims were preempted because they "relate
to a dispute over an event occurring in the workplace" may be
grounded in the fact that the collective bargaining agreement at
issue in that case purported to cover, and thus subject to
arbitration, *any* dispute between the employer and an employee.
*See Johnson* v. *Anheuser Busch*, *Inc.*, 876 F.2d 620, 624, 622 n.1
(8th Cir. 1989).  The court, however, did not make clear how
claims for defamation against non-supervisory co-workers in their
individual capacities require interpretation of the collective
bargaining agreement simply because those statements were
"reduced to writing" and "served as the basis for the conclusion"
that the plaintiff had committed a fire-able offense,
particularly where the court also held that the same defamatory
statement made by the alleged tire-slashing victim (one of the
named individual defendants) to his auto insurance company was
*not* preempted.  *See id.* at 624-625.

F. Supp. at 824; *compare Johnson* 876 F.2d at 624 (defamation claims were preempted where allegedly defamatory statements by co-workers that caused employer to initiate disciplinary proceedings were reduced to writing during grievance process), *with Luecke* v. *Schnucks Markets, Inc.*, 85 F.3d 356, 360 (8th Cir. 1996) (holding defamation claim arising from employer's statement that plaintiff had refused to take a mandatory drug test posed strictly factual inquiry and thus was not preempted, where employee was not disciplined as a result of failing to take test).

Second, whether the resolution of a defamation claim depends on the interpretation of a CBA simply because the employer alleges that some (usually unspecified or very broad) provision of the CBA *may potentially* authorize the defamatory conduct at issue, and thereby create some sort of privilege. *See Johnson*, 876 F.2d at 623-24 ("the preemption issue cannot be resolved solely on the allegations found in the complaint. Defenses, as well as claims, must be considered in determining whether resolution of the state law claim requires construing the collective bargaining agreement."); *Rogers*, 389 F. Supp. 2d at 111 ("the inquiry is not 'purely factual' because the defamation claim requires an examination of the CBA to determine whether it allows NSTAR, in the course of its business, the conditional

privilege to publish comments about plaintiff in his 'personnel files' or otherwise during the course of employment. The CBA provides that NSTAR has the right to discipline employees and 'to exercise the . . . customary functions of Management in carrying on its business").

As to the first point of disagreement, I conclude the correct view is that a defamation claim does not necessarily require interpretation of a collective bargaining agreement simply because there is a close nexus between the defamatory statement and the employee's discharge pursuant to the terms of the CBA. The Supreme Court has made clear that § 301 will not necessarily preempt state law claims arising from "precisely the same set of facts" as a dispute under a collective bargaining agreement, "as long as the state-law claim can be resolved without interpreting the agreement itself." *Lingle*, 486 U.S. at 409-10 (holding state claim for retaliatory discharge did not require interpretation of CBA where claim only required proof that employee was discharged or threatened with discharge, and that the employer's motive in doing so was to deter or interfere with the exercise of rights under the act).

As with the retaliatory discharge claim at issue in *Lingle*, in order to prevail on their defamation claims, Plaintiffs here must prove that Defendants are "at fault for the publication of a

false statement regarding the plaintiff[s], capable of damaging [their] reputation in the community, which either caused economic loss or is actionable without proof of economic loss." *White* v. *Blue Cross & Blue Shield of Mass., Inc.*, 809 N.E.2d 1034, 1036 (Mass. 2004). No element of the claim requires the interpretation of the collective bargaining agreement; it involves principally the truth or falsity of Defendant Ms. MacDowell's allegations that Plaintiffs falsified patient records and her motivation in making those allegations. To be sure, there will be significant factual overlap between the defamation claims and the claim for wrongful termination adjudicated at the grievance arbitration, but this overlap between separate claims does not, by itself, necessitate preemption. *See Lingle*, 486 U.S. at 409-10.

As to the second point of disagreement, last year I expressed the view that an employer's defensive "injection of the CBA into the case" does not necessarily trigger complete preemption under § 301. *See Hernandez* v. *Harvard Univ.*, 2013 WL 1330842 at *3 (D. Mass. Mar. 28, 2013). I adhere to that view. The Supreme Court made this clear in *Caterpillar Inc.*, v. *Williams*, 482 U.S. 386 (1987), stating as follows:

> It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide

whether the state claim survives. But the presence of a
federal question, even a § 301 question, in a defensive
argument does not overcome the paramount policies embodied
in the well-pleaded complaint rule - that the plaintiff is
the master of the complaint, that a federal question must
appear on the face of the complaint, and that the plaintiff
may, by eschewing claims based on federal law, choose to
have the cause heard in state court. When a plaintiff
invokes a right created by a collective-bargaining
agreement, the plaintiff has chosen to plead what we have
held must be regarded as a federal claim, and removal is at
the defendant's option. But a defendant cannot, merely by
injecting a federal question into an action that asserts
what is plainly a state-law claim, transform the action into
one arising under federal law, thereby selecting the forum
in which the claim shall be litigated. If a defendant could
do so, the plaintiff would be master of nothing. Congress
has long since decided that federal defenses do not provide
a basis for removal.

*Id.* at 400 (citations and footnotes omitted). As the Supreme

Court explained in *Caterpillar*, complete pre-emption is an

exception to the well-pleaded complaint rule only insofar as it

prohibits a plaintiff from avoiding federal court simply by

relabeling, as state tort claims, claims that are dependent on a

collective bargaining agreement. *See id.* The doctrine does not

permit the removal of a plaintiff's claim merely because the

employer alleges that it can mount some defense that may rely on

an interpretation of the CBA. *See id.*, *DiGiantommaso* v. *Globe*

*Newspaper Co., Inc.*, 632 F. Supp. 2d 85, 88 (D. Mass. 2009). *But*

*see Johnson*, 876 F.2d at 623-24.

Further, even if § 301 were interpreted to require a court

to consider an employer's invocation of the CBA in a defensive

argument when deciding the complete preemption issue, a court can properly reject such an argument without engaging in any forbidden "interpretation" of the agreement. Courts finding a lack of preemption frequently will *consult* the applicable CBA to determine whether, despite what the defendant employer might claim, there is no "real interpretive dispute" regarding whether the CBA authorizes the allegedly defamatory conduct. *See, e.g., Luecke*, 85 F.3d at 360 (no preemption where "no express or implied term in [the CBA] guides the factual inquiry into whether the speakers actually [uttered the allegedly defamatory statements], whether their statements were false, whether malice attached, and whether damages resulted"); *Hanks* v. *Gen. Motors Corp.*, 906 F.2d 341, 345 (8th Cir. 1990) (tort claims against employer who required employee to work with a person who sexually abused her daughter were not preempted, as "none of the terms or provisions of that agreement shed any light on the appropriateness of [the employer's] conduct[]"); *Tellez* v. *Pacific Gas & Elec. Co.*, 817 F.2d 536, 538 (9th Cir. 1987) (defamation claim against employer who distributed a suspension letter saying employee had bought drugs on the job was not preempted, as the collective bargaining agreement did not require management to send such a letter or provide guidelines if such a letter was sent); *Poole* v. *Mackey*, 891 F. Supp. 2d 255, 260

(D.R.I. 2012) (professor's libel claim against colleague was not preempted where "no part of the analysis of Plaintiff's libel claim represents 'a *real* interpretive dispute' of the Contract language;" noting "it is unlikely that any union contract would confer privilege on a co-worker's submission of malicious lies [to tenure committee], if indeed, Plaintiff's allegations prove to be true.").

A rule that would prohibit a court from even consulting a collective bargaining agreement to determine whether resolution of a defamation claim arguably hinges upon an interpretation of that agreement is improvident – in that it allows a defendant to avoid liability based on the mere possibility that the agreement authorizes the alleged defamation – and inconsistent with existing Supreme Court precedents which expressly permit mere *consultation* of CBAs and make clear that not every dispute between a unionized employee and her employer is necessarily preempted by § 301.

a. *Defamation by Direct Statements*

Turning to the specific facts of Plaintiffs' allegations in this case, I conclude that the defamation claims arising out of Defendant MacDowell's accusations that Plaintiffs falsified patient records do not require interpretation of the collective bargaining agreement, and thus are not subject to complete

preemption under § 301. As previously discussed, Plaintiffs need only prove that Ms. MacDowell made the allegations, that the allegations were false, and that they caused Plaintiffs economic harm. *See White* 809 N.E.2d at 1036.

Further, to the extent that Defendants are prepared to argue that Ms. MacDowell's communication of the allegedly defamatory allegation was privileged, I make two observations. First, the privilege that the Defendants presumptively will assert exists as a matter of state common law, *Bratt* 467 N.E.2d at 129; it plainly does not arise out of a broad management rights clause or some right to investigate as set forth in the collective bargaining agreement. Second, and more importantly, the privilege is a *conditional* privilege that may be lost, where, as Plaintiffs allege here, the defendant acted with malice (or even recklessness) in publishing the defamatory information. *Id.* at 131. No conditional privilege, either at common law or derived from the terms of a collective bargaining agreement, would protect the right of a defendant knowingly to make false allegations regarding an employee as part of a personal vendetta against that employee. *See Ezekiel* v. *Jones Motor Co.,* 372 N.E.2d 1281, 1287 (Mass. 1978) (defendant employer could lose privilege of communicating reasons for plaintiff's discharge to union grievance board if statements were made out of actual

malice or reckless disregard for plaintiff's rights); *Poole*, 891 F. Supp. at 260 ("it is unlikely that any union contract would confer privilege on a co-worker's submission of malicious lies")

   *b. Defamation by Conduct*

   In addition to the allegedly false, malicious allegations made by Ms. MacDowell, Plaintiffs claim that MVH defamed them by the very act of terminating them.  Because the collective bargaining agreement only permitted MVH to terminate Plaintiffs for cause, they argue the fact of their termination "communicated and conveyed a clear and unambiguous statement to the MVH community, and to colleagues and friends of [the plaintiffs] that [they] engaged in wrongful conduct."  Am. Compl. ¶ 89.

   Defamation by conduct is a recognized cause of action in Massachusetts.  *See Phelan*, 819 N.E.2d at 554 ("we conclude that defamatory publication *may* result from the physical actions of a defendant, in the absence of a written or spoken communication." [emphasis in original]); *Jorgensen* v. *Massachusetts Port. Auth.*, 905 F.2d 515, 520 (1990) (defamation requires "a communication that brings an idea to the perception of others.").  However, as with a traditional defamation claim, a plaintiff alleging defamation by conduct bears "the burden of proving that a reasonable third person observing [the defendant's] conduct would have understood it to be defamatory."  *Phelan*, 819 N.E.2d at 555.

In the circumstances of this case, Plaintiffs cannot possibly satisfy that burden without obligating the court to engage in an interpretation of the collective bargaining agreement to explore the multitude of reasons why an employee might be discharged pursuant to that agreement. Whether the cause was just, of course, is what the arbitrator undertook to resolve in this dispute pursuant to the CBA. Accordingly, Plaintiffs claim for defamation by conduct is completely preempted by § 301 and, indeed, has already been addressed pursuant to the CBA.

### 2. Intentional Interference with Contractual Relations (Count II)

Plaintiffs also bring claims against Defendants Ms. Lovallo and Ms. MacDowell for intentional interference with contractual relations, alleging that they "knowingly induced MVH to break [the plaintiffs'] employment relationship when they decided to intentionally misconstrue the use of the F5 copy and paste function on their computer system to rise to the level of 'falsification' of patient records and terminate the Plaintiffs." Am. Compl. ¶ 93. Plaintiffs further allege that "[t]his interference was improper in motive and/or means because Ms. Lovallo and Ms. MacDowell acted out of vengeance when they specifically targeted Plaintiffs, and only the Plaintiffs, in retaliation for reporting patient safety reports and their role

in the investigation that led to Stacy Steeve's departure." *Id.* at ¶ 94.

In an action for intentional interference with advantageous relations, "a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions." *Blackstone* v. *Cashman*, 860 N.E.2d 7, 12-13 (Mass. 2007).  When the claim arises out of an employment relationship and the defendant is the plaintiff's supervisor, the plaintiff must prove that the defendant acted out of "actual malice," defined as a "spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Id.* at 17, 13 (quoting *Wright* v. *Shriner's Hosp. for Crippled Children*, 589 N.E.2d 1241, 1246 (Mass. 1992)).  This heightened "actual malice" standard is grounded in the sensible policy that corporate officials acting "within the scope of their employment responsibilities" are "privileged to act [unless they do so] out of malevolence." *Gram* v. *Liberty Mut. Ins. Co.*, 429 N.E.2d 21, 24 (Mass. 1981).

Defendants argue that claims for intentional interference with contractual relations are "universally preempted by Section 301" because in order to prove that a defendant induced a breach of contract, a plaintiff must necessarily prove that the applicable collective bargaining agreement was breached.  In this case, Defendants contend that the court would have to interpret the collective bargaining agreement to determine whether MVH breached the agreement, or put differently, whether it had just cause when it terminated the plaintiffs' employment.

Defendants cite to several cases within this circuit that at least on their facie appear to support their argument.  In *Magerer* v. *John Sexton & Co.*, 912 F.2d 525 (1st Cir. 1990), an employee who was terminated after missing several days of work due to an injury brought suit against his employer and former supervisor, asserting among other claims, a claim for intentional interference with contractual relations.  *See id*. at 526-37.  The employee had not grieved his termination under the applicable collective bargaining agreement.  *Id*. at 531.  The court held that the plaintiff's interference claim was completely preempted because "[t]he determination of whether [the supervisor] induced [the employer] to break its employment contract with plaintiff would require the court to decide whether [the employer] was entitled to discharge plaintiff under the terms of the collective

-34-

bargaining agreement.  In other words, the [claim] would require an interpretation of the collective bargaining agreement." *Id.* The *Magerer* court also cited to *Kneeland* v. *Pepsi Cola Metro. Co., Inc.*, 605 F. Supp. 137, 139 (D. Mass. 1985), for the somewhat different proposition that "claims against supervisory employees for malicious interference with contractual relations were preempted, because supervisors were acting as agents for employer whose conduct was governed by a collective bargaining agreement." *See Magerer*, 912 F.2d at 530.

In *Rogers*, 389 F. Supp. 2d at 105, the plaintiff unsuccessfully grieved his termination, and then brought suit against his employer and a co-worker alleging, among other things, intentional interference with contractual relations.  The court stated emphatically: "[t]here is no question that Section 301 also preempts this claim." *Id.* at 109.  The court explained that, in order "[t]o decide whether [the co-worker] interfered with plaintiff's contractual relationship with [the employer], the court must determine whether [the employer] breached its contract with plaintiff.  That, in turn requires a determination whether [the employer] had just cause, under the contract, to terminate [the plaintiff]." *Id.*

In the final case cited by the defendants, *Acciavatti* v. *Prof'l Servs. Group, Inc.*, 982 F. Supp. 69, 73 (D. Mass. 1997),

in which an employee unsuccessfully grieved his termination, and
then subsequently brought claims including a claim for
intentional interference with contractual relations against his
supervisor, the court held that the claim was preempted under
both of the rationales set forth in *Magerer*: that "the defendant
supervisor's actions were governed by the collective bargaining
agreement," and that "[t]he ultimate determination of whether
[the employer] 'broke' the contract . . . turns on an initial
determination of whether [the employer] was entitled to discharge
[the plaintiff] under the CBA's terms." *Id.* at 76.  In response
to the plaintiff's argument that the supervisor acted beyond the
scope of his employment in discharging the plaintiff, the court
reasoned that "determining whether [the supervisor] acted within
the scope of his employment requires reference to, and
interpretation of, the CBA." *Id.*

Notwithstanding these cases, I do not find Plaintiffs'
intentional interference claims against Ms. Lovallo and Ms.
MacDowell to be completely preempted by § 301.  During the course
of proceedings in this case, I posed to the parties the question
whether it made any difference to Defendants' preemption
arguments that the "contractual apparatus has been satisfied,"
i.e., that the parties have completed arbitration, with the
arbitrator finding that MVH lacked just cause to terminate

Plaintiffs.  Defendants represent in their briefing on their
motion to dismiss that they "have found not a single case
suggesting that the timing of the lawsuit *vis a vis* the status of
the arbitration has any impact whatsoever on the analysis of
whether or not state law claims are preempted."  However, my
concern is not so much with the *timing* of the commencement of
this lawsuit, but with the fact that, pursuant to the grievance
process outlined in the CBA, arbitration has been completed with
the arbitrator finding that MVH lacked just cause to terminate
Plaintiffs.[5]

Although I acknowledge that at least one court has held an
intentional interference claim preempted even where a labor
arbitrator has already found the defendant employer to have
breached the "just cause" provision of a collective bargaining
agreement, *see Johnson*, 876 F.2d at 622, 624, I am not bound by
Eighth Circuit's decision and with respect decline to follow it.
I disagree that the result of the labor arbitration in this
context is irrelevant to the preemption analysis.  I follow, as I
am bound to, the First Circuit's holding in *Magerer,* that a claim
for intentional interference is preempted to the extent that a
court must determine whether there was an underlying breach of

---

[5] To my knowledge, Defendants have not challenged this
determination by timely moving to vacate the arbitral award.

contract, and in doing so interpret the collective bargaining agreement. However, where a labor arbitrator has already concluded that a breach has indeed occurred, it follows that if the element of breach is established, the need for a court to engage in any interpretation of the collective bargaining agreement on that basis is eliminated. At this point, the CBA process having been concluded, there is no national labor law impediment to moving forward on state common law claims. The remaining elements of the cause of action do not depend on interpreting the agreement. *Cf. Lingle*, 486 U.S. at 407 (in case where arbitrator already determined employer discharged plaintiff without just cause, state law claim for retaliatory discharge not completely preempted when "each of [the] purely factual questions [to be answered] pertains to the conduct of the employee and the conduct and motivation of the employer" without need to interpret agreement).[6]

---

[6] While not at issue in this case – because Plaintiffs' state law claim for intentional interference was timely brought within the applicable three year statute of limitations, Mass. Gen. Laws ch. 260, § 2A, even when calculated from the date of termination – I observe that the potential for injustice may arise where the pendency of a CBA-mandated grievance and arbitration process extends past the limitations period under the applicable statute of limitations. In that instance, however, a court could presumably invoke the doctrine of equitable tolling or stay a prematurely-filed suit pending the issuance of a final arbitration award finding a breach of the applicable CBA. *Cf. Heck* v. *Humphrey*, 512 U.S. 477, 489 (1994) (acknowledging the historical use of equitable tolling in the context of suits under

As to the suggestion in both *Magerer* and *Acciavatti* that intentional interference claims are otherwise completely preempted for the additional reason that a court must interpret the collective bargaining agreement to determine whether the supervisor was acting within the scope of employment, I believe the principle to be inapplicable on the facts of this case, where Plaintiffs have pleaded actual malice and Massachusetts law makes clear that actual malice negates any privilege that an employer's supervisor might otherwise invoke. *See Blackstone,* 860 N.E.2d at 17. Further, as expressed in Section II.B.1, *supra*, I am not satisfied the defensive invocation of a privilege that *may* conceivably arise from a collective bargaining agreement squares with the Supreme Court's rejection in *Caterpillar* of defensive § 301 arguments as a basis for complete preemption. *See Caterpillar*, 482 U.S. at 400.

### 3. Intentional Infliction of Emotional Distress (Count III)

Plaintiffs' final claim is that Defendants Ms. Lovallo and Ms. MacDowell intentionally inflicted emotional distress upon them when Ms. Lovallo carried out a personal vendetta against

---

42 U.S.C. § 1983 that depend on the resolution of underlying state criminal actions) and *id.* at 499 (Souter, J., concurring in judgment) (suggesting that federal courts would be forced to stay prematurely-filed suits if the cause of action under § 1983 accrued prior to the favorable termination of plaintiffs' criminal case).

them, including repeatedly threatening to fire them over a period of years and ultimately causing them to be fired, and when Ms. MacDowell "repeatedly leveled false accusations against Plaintiffs" leading to their termination.  Am. Compl. ¶¶ 96-104.

To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." *Sena* v. *Commonwealth*, 629 N.E.2d 986, 994 (Mass. 1994).  None of these elements requires an interpretation of the collective bargaining agreement.  The conduct alleged to be extreme and outrageous spanned a period of years, exceeded the scope of the discipline and grievance process itself, and is not limited to the discrete act of terminating Plaintiffs.  This case is therefore distinguishable from *Flibotte*, in which the First Circuit held a claim for intentional infliction of emotional distress preempted by § 301 where the claim was brought against the employer, not an individual, and the conduct that was alleged to be extreme and outrageous was the very act of terminating the plaintiff for refusing to take a drug test purportedly required under the terms of the CBA.  *See* 131 F.3d 21 at 27.

### III.  CONCLUSION

Defendants' motion to dismiss [Dkt. No. 26] on § 301 complete preemption grounds is DENIED, except as it pertains to so much of Count I as alleges defamation by conduct against MVH.

I have not considered and do not resolve Defendants' other arguments in their motion to dismiss pertaining to both the adequacy of the amended complaint and possible state statutory preemption of Plaintiffs' claims for intentional infliction of emotional distress because I decline under 28 U.S.C. § 1367 to exercise supplemental jurisdiction over the remaining state claims at this threshold stage in the litigation.  Dismissal would be permissible.  *See, e.g.*, *Rodriguez* v. *Doral Mortgage Corp.*, 57 F.3d 1168, 1177 (1st Cir. 1995) ("As a general principle, the unfavorable disposition of a plaintiff's federal claims at the early stages of a suit, well before the commencement of trial, will trigger the dismissal without prejudice of any supplemental state-law claims."); *Martinez* v. *Colon*, 54 F.3d 980, 990 (1st Cir. 1995) (affirming the dismissal without prejudice of pendent claims when the district court determined "far in advance of trial that no legitimate federal question existed"); *Cf. United Mine Workers of America* v. *Gibbs*, 383 U.S. 715, 726 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should

be dismissed as well."). Rather than dismissal, however, I choose – in the interests of orderly judicial administration and to avoid the necessity that plaintiff must begin this litigation anew – to remand the matter to state court where it began. *Dunn v. Trustees of Boston Univ.*, ___ F.3d ___, 2014 WL 3733984 at *3 (1st Cir. July 30, 2014) (acknowledging that § 1367 permits remand to state court of remaining state law claims). *See Connolly* v. *H.D. Goodall Hosp., Inc.*, 427 F.3d 127, 128 (1st Cir. 2005); *cf. Carnegie-Mellon Univ.* v. *Cohill*, 484 U.S. 343, 359 (1988) (recognizing discretion of district court to remand remaining state law claims to state court in lieu of outright dismissal). The case is hereby REMANDED to state court for resolution of the remaining claims.


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT